Nadolny against Wilkie. Mr. Sebekus. Good morning, Your Honor. May it please the court. My name is Peter Sebekus. I'm here representing appellant military veteran Gordon Nadolny. And this appeal raises two central issues. The first has to do with whether there are any implications to a military department, one of the branches of the military, ignoring its own regulation, which specifies that a specific physical defect disqualifies an enlistee from serving in the military. In this case, the service department, the United States Commission, specified that Mr. Nadolny was disqualified from service due to a macular hole in his right retina, which was discovered two days after he entered the military. The service department did nothing to fully inform him of the nature of the defect. Wasn't this decided in 1977? Yes, it was, sir. And so if you're coming here now, don't you have to show clear and unmistakable error? Yes, Your Honor. That the result would have been different? Yes. And isn't that a facts question that is beyond us? The issue of whether or not this regulation was on the books in 1972 when he enlisted, that is a separate issue that I am not arguing. I'm not arguing a factual issue. I'm arguing that there was a regulation in effect. And that regulation, if you look at the parameters of a Q argument, it says that revision of a prior final decision will be warranted if the law that was in effect at that time and the facts that were present at that time were not followed. In this case, the Board of Veterans' Appeals in 1977, at that time, there was a US Army regulation. And they totally ignored the fact that this particular serviceman was allowed to serve when his service was putting his right eye vision at great risk. And this was acknowledged by the United States Army in their own regulation. They chose to ignore that regulation and allow this individual to continue to serve for three years. When he came out of the military, he was given a separation exam. On that separation exam, the examiner wrote that there were no problems with his right eye, even though when he had enlisted, they found that his visual acuity in the right eye was 2,400. And two days later, they found that he had a macular hole. So I'm making the legal argument, Your Honor, that there has to be some implication when the service department ignores its own regulation. And that is a law that was in effect in 1977 and that was not applied or even recognized. But wasn't that subject to appeal at that time? No, sir, it was not. There was no veterans court at that time. The veteran was severely disadvantaged. Because one thing that I was there was no right to appeal, then that's it. Well, no, it's not it. Because in 1997, the United States Congress said that veterans who felt that they were deprived of a benefit due to a board decision that contained clear and unmistakable error could seek revision of that decision. And that goes to the second argument I'm making. Congress said in 1997 that this remedy would be available. It had previously been available when the veteran was challenging a regional office decision. Now for the first time, the congressman who introduced this legislation on the floor of the House, Congressman Lane Evans from Indiana, specifically said when a veteran has provided first class service to his country, he's entitled or she is entitled to first class justice. The VA had this legislation, and its job was then to enact the regulations to put it into effect. I want to be sure I understand the argument on the merits. You're not arguing that this is not a pre-existing condition. No, I'm not. You're saying that because they allowed him to serve with a pre-existing condition, the government became responsible for the consequences of that condition. Yeah, but thank you for giving me an opportunity to clarify something that might have been not totally clear in my brief. I'm arguing that the statutory provision in 1977, when the Board of Veterans Appeals denied his appeal, that the relevant statute was what was then codified at 353 United States Code. That was what's called the presumption of aggravation. He went into the military, and on his enlistment exam, the examiner did note a problem with his right eye. The examiner, who had no tools to really make a refined, informed diagnosis, saw that he had this problem with his distance vision in the right eye. And just from his knowledge of ophthalmology, general knowledge, he wasn't a specialist necessarily, he said that I'm going to diagnose this as amblyopia, which is a defect in your visual acuity with no apparent lesion on the macula lutei of your retina. I don't fault that examiner, and I'm not here to argue facts. What then occurred, apparently, was the soldier was enlisted. He took a train from Michigan to Fort Knox, Kentucky. And when he got off of the train, he boarded a bus to go from the train station to the base. He arrived at the base, he stepped down the steps of that bus, and when he hit the ground, there was a sergeant with a clipboard. And the sergeant, or someone else who did the intake at Fort Knox, said to him, before you do anything, before you get your buzz cut, before you get your uniform, Mr. Nadolny, you have to report to Ireland Army Hospital. He dutifully reported to Ireland Army Hospital, and he was directed to the ophthalmology department. Well, all of that is very interesting and unfortunate, but isn't the issue before us whether the Court of Appeals for Veterans Affairs correctly decided that the board previously decided that there was no queue in the 1977 decision? And isn't that fact-related beyond us? No, it is not, Your Honor, because the problem with the court's decision was that, well, first of all, they had their own law to interpret, and they didn't address the arguments that were made in the briefs to them. Those arguments involved whether or not the board had any responsibility to acknowledge and consider the consequences of the military ignoring its own regulation. So that was a legal issue. Secondly, the Court of Appeals for Veterans Claims did not consider the second part of our legal argument, which is whether or not the VA's regulations implementing that 1997 change in the statute, which allowed veterans to go to the board and say, respectfully, gentlemen, or ladies, you made a mistake 20 years ago, and I'd like you to correct that mistake. I like revision, queue. And does queue, should the queue parameters preclude a veteran from looking back at that BVA decision and say, that board introduced out of thin air a fact and put it into the equation that determined the outcome of that claim? The board, in 1977, looked at this claim. In a single sentence, they mentioned the fact that he had been diagnosed with a macular hole. But then they ignored that fact for the rest of their decision. And they said, the claim before us involves aggravation of amblyopia. That was totally wrong. Their analysis was totally wrong. The claim was, I went into the military, I was diagnosed with amblyopia, but that diagnosis was corrected two days later. The board said in 1977, this is a claim involving amblyopia. And aside from a single remark recognizing that there had been a diagnosis two days later, they then I'm sure I understand where you're taking us. In either case, it's not disputed that it was pre-existing. No, that's not what we're arguing. We're arguing that. So we have a pre-existing condition, which is called one thing or another. And years later, something else happens to the eye, which may very well have flowed from that pre-existing condition. We're not. How do we? No one says that there was any mistake in that connection. So how do you take us to responsibility for that? The regulation that was in effect in 1977, a VA regulation, another regulation that was ignored in the decision that we're seeking revision of, the regulation had to do with what evidence should the VA look at to determine whether or not a pre-existing condition had been aggravated. Because you can be service-connected on the basis of aggravation. And the regulation said that you had to look at the evidence of the condition prior to service. You had to look at the evidence regarding the condition during service. And you had to also look at the evidence regarding that medical condition subsequent to service. This is where the board, in 1977, failed to apply a then-existing VA regulation. They first misidentified the medical condition that was at issue by calling it, saying, this veteran had amblyopia when he entered the military. No, that was false. The veteran had an eye condition which was diagnosed as amblyopia. And two days later, someone with the proper equipment corrected that diagnosis and identified a macular hole. The veteran served for three years. He then was separated from the military. And in his separation exam, they didn't do anything to look at whether that macular hole had gotten worse or not. He then goes out into the civilian world, and he has to go get a driver's license. He applies for a driver's license. They have him cover his left eye and read the eye chart. And the state of North Carolina said, sorry, sir, no driver's license for you. That motivated him to go to see an ophthalmologist. The ophthalmologist said, upon looking at his right eye under a scope, sir, I can't do surgery right here and now in my office. I'm directing you to go immediately to the VA hospital down the road, where he went and he was admitted. And the very next day, he had surgery for a detached retina. So what I am contending, what the veteran is contending, is that the board did not look at the condition. And they misidentified the medical condition at issue, which rendered their decision kind of off point. And then they failed to apply the VA regulation that said you have to look at the condition before, during, and subsequent to service. They ignored the subsequent to service part to a large extent. And they, and I'll go into my final time if I have to. And then the board concluded that his amblyopia had not gotten worse. Now, he did not have amblyopia. He had a macular hole. And he had served for three years. He had gone through basic training. In 1997, when the board made its decision, did it have evidence before regarding the macular hole? Yes, it did. It had the service record. So it did consider the macular hole. Your Honor, what the board said was, when he came into the military, he had amblyopia. And so let me just spin this out for you. No, I'm trying to get you to a point because you're almost out of time, or I think you may be out of time. In 1997, the board did consider the macular hole problem, correct? No, I would say no to that question. You say no because the record is kind of silent as to that point. We don't know precisely whether it did or not, right? They mention a macular hole by saying, an ophthalmology exam revealed a macular hole on the right. But then when you go down to their discussion and an evaluation, and when you go to their findings of fact, the first finding of fact is, upon entry into service, he had amblyopia. There was no gross change in his visual acuity between entries into service and separation. OK, well, what I'm asking is very specific. In 1997, did the board consider or have before it the evidence concerning the macular hole? They had the evidence. They, in a single sentence, mentioned it. How can they say that the board clearly erred? Maybe there's an error there, but is it clear error? Yes, sir. And it's outcome determinative as well. Let me just go back and finish the answer to your question, and I'll be very brief. They mentioned that he was diagnosed with a macular hole several days after he entered service. But then when they go down to whether or not that his eye condition increased in severity, their response is there in the findings of fact, number two, at appendix 55. The board says, there was no gross change in his visual acuity between entry into service and separation. That is the telltale. They were not looking at, they were not asking whether a macular hole had increased in severity due to in-service aggravation. What they were doing was asking, did the amblyopia get worse? Because if you have a macular hole, and you have 20 slash 400 vision, your visual acuity is not going to get any worse. But if you have a macular hole, what will happen under the rigors of military service is that macular hole will get worse, and you'll end up with a detached retina. What the board concluded by focusing on the wrong consequence, visual acuity as opposed to the integrity of this gentleman's retina, they concluded that he had served for three years, he had been a civilian for 29 days, and he had gone to an eye doctor after being rejected for a driver's license. And that eye doctor took a history, directed him to go immediately to the VA hospital. And in that history, the doctor wrote, no sudden onset. There was no event in those 29 days which indicated that anything had dramatically changed the integrity of his retina. So the board was presented, but ignored in 77, an issue. Which was more likely? Whether his macular hole had progressed to a detached retina in 29 days of civilian life when he went to a doctor after being denied a driver's license, and the doctor said to him, whoa, you better get to the VA hospital today. And the veteran, in response to that, said, nothing's happened since I've been discharged from the military. That's caused the physician to write, no sudden onset in his report. OK, thank you. You answered my question. OK, very good. Thank you, Your Honor. OK. Thank you, Mr. Speckles. Ms. Jansen. Good morning. May it please the court. Mr. Nadolny honorably served this country during the Vietnam War era. After leaving service, he suffered a detached retina in his right eye, for which he then sought service connection disability compensation. Although the board, in 1977, denied his claim, Mr. Nadolny sought to reopen that claim in 2006, and when he presented new and material evidence, his request was granted. He was granted service connection benefits related to his right eye, which he continues to receive to this day. Now, however, before this court, Mr. Nadolny asks us to revisit the 1977 board decision and find that there's clear and unmistakable error, based on a medical opinion that was rendered at that time, which concluded that there was no causal relationship between the macular hole that was found in service and his post-service disability of a detached retina. In doing so, he asked this court to create a third exception to the rule of finality by allowing Q, clear and unmistakable error, to be found based on a disagreement with a medical opinion that was offered before the boards, and before 1991, when the board was required to obtain an independent medical evaluation. And this, the court cannot do. As the court held in Cook, there can be no judicially created exceptions to the rule of finality. There exists two exceptions to the rule of finality, which are provided for by statute, and that is Q, clear and unmistakable error, and the new and material evidence standard. Mr. Savico said there was no opportunity to appeal the 1977 decision, right? That's true. But that board decision then became final, which then paved the way for this new and material evidence standard. And also, Q claims could be brought in order to look back at earlier decided claims to see if there was a reason to do that. So he's not raising a, he hasn't shown a Q basis here, just a difference of opinion concerning the original diagnosis. That's correct. And these types of claims are specifically prohibited by the regulations, and also by this court. But in the federal regulation, and I'm looking at 38 CFR, section 20.1403 codifies what can constitute Q and what cannot constitute Q. And a changed medical diagnosis, so a diagnosis that seeks to revise prior medical diagnosis, cannot form the basis for a Q claim, nor can an evaluation of evidence claim or a disagreement with facts that had been previously determined. Even if it's shown that if the correct diagnosis had been made, then he would have been able to recover. Correct. You know, a difference of diagnosis cannot form the basis of Q, unless you can show that there is some clear, mistakable error. That is not the situation that we are in here. We are talking about a difference. You just read a regulation to me, to us, that said a change in diagnosis cannot be Q. That's correct. I mean, if the original diagnosis was itself could constitute clear and unmistakable error, for example, you're diagnosed with heart failure, and one doctor says, no, I think you just stubbed your toe. So there, you might have a basis to say any lay person would recognize that that was clearly erroneous and would constitute. Notwithstanding the regulation you read to us? Well, the regulation seems pretty clear on its face, and it clearly controls the outcome here. In any event, we're not dealing with stubbing a toe. We're not dealing with stubbing a toe. We're not dealing with a gross change in diagnosis. What we're talking about is an eye condition, a couple different eye conditions, in fact, which can have multiple causes, and the pathophysiology of which is not well understood and is still not well understood. In fact, today, even a macular hole accounts for something less than 1% of all detached retinas. Furthermore, the board in 1977 was not presented with evidence that Mr. Nadolny subsequently presented to the board in 2006 of some in-service injuries or traumas that he sustained. And he got 30% disability for that. He is receiving 30% disability for that, which is the highest disability he can receive. Does it matter whether or not the 1977 board considered evidence about the molecular hole? The macular hole, well, that was in the record, and it was before the board. And they mentioned it in the findings. So that was clearly something they considered, and they weighed. And the doctors who were sitting on the board would have considered that diagnosis as well. They understood at that time already about the detached retina, right? That problem had already occurred? The detached retina occurred after service. Yes, but before the board decision? Correct. Correct, so there are actually two determinations here that the board needed to make and that they did, which is first, it was the amblyopia. So why wouldn't this case fall into that 1% that you talked about, a detached retina due to a macular hole? Well, it could have. It could not have, but that was in the discretion of the board, and they had a medical opinion that weighed in on that. But typically, there needs to be more than just a macular hole to lead to a detached retina, a clear case of some evidence that can kind of sway in the direction of causation. But we don't know that from the board's decision. We don't know what you're arguing now. We don't know that from the board decision. But we do know that there wasn't any evidence of injury or trauma while he was in service. Well, the detached retina. But that did not occur in service. Well, they found out two days after he left service that the retina had detached, or thereabouts. 29 days. 29 days. Correct, but there was no evidence while he was in service that he sustained any kind of trauma to his eye or his head that could have been subsequently caused a detached retina. But they found the detached retina really right after he left the service. Why does it matter whether they knew he had the macular hole before he entered the service or two days after he entered when there is this very close relationship of a detached retina, which nobody seemed to say in the record, this must have happened in those 29 days? So if I understand your question, why does it matter that the macular hole was diagnosed early on in his in-service career? When you have the disability, the detached retina, which is observed so close to the end, to the discharge from service, I don't think anybody says that there's no relationship. They say that it must have occurred, more likely than not, in those 29 days in order to avoid any connection with service. And meanwhile, there is the information of a serious eye problem while in service, whether it happened before or after. Why does that matter? Well, because there still has to be a causal relationship between the in-service, the macular hole, that Mr. Ndolni is now aware of. Well, that's my question. When it's discovered just right after leaving service, isn't there, as we see so often, that this must have been, something must have happened during service, whether there was a prior macular hole, which could have led to the detached retina, or whenever the macular hole occurred, by the time he leaves service, he has a detached retina. Isn't there a presumption of connection? No, there is not. That's a medical question as to whether or not the macular hole actually caused the detached retina. I'm not asking for the finding of fact. I'm asking about presumptions. When a disability is diagnosed promptly after leaving service, isn't there some sort of common sense sense that something must have happened during service? Despite the examination on entry, there was nothing about a detached retina. Correct. I think the presumption of aggravation, which you're alluding to here, is a presumption of connection. I'm not talking about aggravation. That takes us back to the original cause of the retina. Isn't there a presumption of some sort of connection when there is, on leaving service, a disability that everyone agrees was not present when he entered service? He may have had a propensity when he entered, which was discovered. They found the macular hole. The presumption of soundness, perhaps, is what you're referring to. The presumption of connection is what I'm looking for. I don't know of any such presumption. That is what the board determines, is when you have a disability that either arises initially and then gets worse. We presume that's connected during the time that the soldier is in service. Are you saying there's a presumption of no connection? When a disability is discovered promptly after leaving the service? There is no presumption at all. It is up to the board to decide, using the principles of connection disability, to determine whether or not there is a connection. Are you sure? I'm not so sure that precedent supports such a blanket statement, that there's no presumption when a disability is discovered promptly upon leaving service. And it was known it didn't exist when you entered service, that there is no presumption. What is the veteran supposed to do? Go back through every day of those three years? Actually, he did. He said he had been struck on the head, and a few other things happened. He did. He was able to present that evidence. And when that was brought to the new board's attention, they found a connection with the service. It's just that none of that evidence was before the board or in his records in 1977. None of the trauma that he subsequently alleged. In 1977, the board had a diagnosis before it. And that was that the detached retina had been caused either by the cyst or by the macular hole. Correct? Correct. OK, so they did have a diagnosis. It's caused by one of the two things. It seems to me that the board failed at that point to inquire, well, which one is it? Because if it would have been the cyst, then there'd be no connection. If it was connected to the macular hole, then there could be a service connection under the way that Judge Newman has been citing. But the board didn't decide that. The board made no decision at that point. Shouldn't we remand in order for the board now to consider whether the detached retina was caused by the molecular hole or by the cyst? Well, just the board, even if the board properly assumed that the macular hole was diagnosed initially, it still would have to determine that the macular hole caused the detached retina. But it didn't do that. But it did consider that. Because the board instead decided that the cyst was caused. But it could have been caused by the cyst, too. Right, or it could have been caused by something else entirely. But the board doesn't say that. The board doesn't say it was caused by something other entirely. It doesn't say that it was caused by the cyst. It makes no distinction. It says, based on sound medical principles, the cyst predated the detached retina. I mean, the board is a little succinct in its finding, to be sure, but we do know that. What do you mean, succinct? Clear or not enough? It just has a short answer and doesn't elaborate on its medical opinion. But we do know that. So then later, when the additional evidence, the new evidence is presented, which basically is a doctor's corroboration of what the appellant was talking about all along, they did make those connections. They did, Your Honor. But again, that was based on new evidence. Yeah, I just have a hard time seeing why the board would conclude at a later date that the macular hole was the basis for the detached retina. But there was no way of knowing that until much, much later. Why didn't the board know that or consider that in 1997? In 2006, when it made its new determination, it considered testimony that was offered by Mr. Nadolny that he did, in fact, sustain some trauma or some head injury, which based on medical principles in 2006 and a new doctor's diagnosis opinion that that could show that it was likely, more likely than not, that the macular hole progressed to the detached retina. But more likely than not, does not form the basis for error in the 1977 decision. And it certainly doesn't lead to clear and unmistakable error. So if there are no further questions, I respectfully request that this court uphold the decision of the board below. OK. Thank you, Ms. Jansen. Thank you. OK, Mr. Sabikos, you have about four minutes. Thank you, Judge Newman. Thank you. This is a relatively complex case. And some of the questions from the bench and some of the statements were made. Well, it's a complex case if one has to consider the facts. The misdiagnosis. But it's not a complex case when it comes to our review of what the Veterans Court held and the question whether it relates to facts. I agree with you, Judge Lerner. But if you just allow me to finish the thought. I think a number of misstatements were made. And I don't blame counsel. But I will point that out. And some of the questions from the bench, I think, also indicate that the situation, including the legal analysis, most importantly, solely the legal analysis, is not perfectly understood by both sides here. So let me try to clarify. I think in response to Judge Reyna's question, the difference between 1977 and 2006 was, firstly, in 1977, the board misidentified the condition. They looked at amblyopia and whether amblyopia had increased in severity. Amblyopia. I think we understand that part, Counselor. The question you have to deal with is, also at that time, in 1977, the board had before it evidence concerning the macular hull. All they had, Your Honor, was a diagnosis two days into service. And this is where I think we're failing to get to the heart of the matter. In 1977, when they asked the question, had amblyopia gotten worse? Had it been aggravated by service? You cannot get worse than 2,400 in visual acuity. What was really at issue was, did a degenerative eye condition get worse? That is not measured by visual acuity. It is measured by whether or not that retina is still attached to the position in the eye where it needs to be. And 29 days after the veteran left service, we clearly know it was not. There's another misunderstanding. The progression is, someone has what is called a retinal process of the retina. Then that person gets a macular cyst. Then that progresses to a macular hull. Finally, that person has a detached retina. In this case, the board relied upon its own medical opinion, which it was allowed to do at that time. But that medical opinion was clearly wrong. You do not get a macular cyst after you have detached retina. And that's why we have this question about, should the VA be able to prohibit any new evidence when it comes to acute claim? And ordinarily, I would say yes. When this court reviewed the regulations that the VA wrote after Congress amended the statute in 97, it said, you can seek revision of a BVA decision. The court did not have anything related to this question before it. Ordinarily, if you're a veteran and you're denied, and that denial becomes final, you should not be able to come forward with a medical opinion from 20 years down the road and say, on this basis, there was Q in that decision. I have no problem with that. That medical opinion was not on the table. But at that time, the board was able to, on the basis of its own medical opinion, not an independent medical opinion, the board was permitted to decide the claim. Well, what if that medical opinion, what Ms. Jansen referred to as sound medical principles, which is articulated in the board decision from 77, that a macular cyst follows a detached retina. It doesn't occur before you have a detached retina. What if that is 100% incorrect? What if that medical conclusion is contrary to the medical literature that prior to that board decision has been around for 50 years? And I cited that in my Q motion. Now, ordinarily, you should not be able to go back and say, well, here's something that wasn't in the claims file. But I want you to look at it in the context of a Q motion. But what if the board itself introduced a fact that was incorrect and can be shown irrefutably as being incorrect on the basis of the medical literature that was in place on that date? I showed that in my Q motion. And what the VA is saying is, and what the lower court didn't even address, is why should the rule, this black and white rule for no new evidence, why should that apply under this set of circumstances? The Veterans Court itself said that a Q motion is seeking to show what the correct facts were on the date of that decision, what the correct law was on the date of that decision. And based upon the correct facts and the correct law, review that decision and revise it. In this case, the board itself, it was lawful for the board to do this. But it's not the question whether it was lawful or unlawful. The question is, was the board introducing on its own a clearly erroneous fact in an equation that consisted of the first term of the equation was a condition noted at entry, revised diagnosis two days later, plus military service, plus 29 days of civilian life. And here comes the board. And into this equation, they introduce what was clearly an unsound medical principle. You do not get a macular cyst after a detached retina. It is a precursor to a detached retina. So they introduced an unsound medical principle. They misidentified the medical condition in question. And they ignored the presumption that you were searching for, Judge Newman, the presumption of aggravation, which was to be determined by looking at all the evidence before, during, and after service. They ignored the fact that on the 29th day, he goes to a doctor. And he gives a medical history to the doctor. Well, sir, what happened recently to cause this? Nothing I know of. I just came out of the military. So the point is, should they be permitted to just ignore the fact that their doctor mistakenly put an element into the decision-making process? Thank you, Your Honors. I really appreciate your consideration. OK, thank you. Thank you both. The case is taken under submission. That concludes our argued cases for this morning. All rise.